IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.   1:21-cr-28-8 (APM) |
| | ) | |
| KELLY MEGGS, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT KELLY MEGGS'S
MOTION FOR ISSUANCE OF A *SUBPOENA DUCES TECUM*
TO THE U.S. CAPITOL POLICE**

The United States respectfully opposes Defendant Kelly Meggs's Motion for Issuance of a *Subpoena Duces Tecum* to the U.S. Capitol Police (USCP) (ECF Nos. 500, 501). Many of the records and documents requested in the subpoena have already been provided or will be provided in discovery. The government thus submits that Defendant Meggs's motion is premature. Further, several of the requests in the proposed subpoena are overly broad, and thus fail to satisfy the relevancy, admissibility, and specificity requirements set forth in *United States v. Nixon,* 418 U.S. 683 (1974). For these reasons, the United States respectfully requests that the Court deny Defendant Meggs's motion.

**I.      Legal Standard**

Federal Rule of Criminal Procedure 17 provides that a party may issue a subpoena requiring an individual "to produce the books, papers, documents or other objects designated therein." Fed. R. Crim. P. 17(c). However, the Rule further provides that the Court "may quash or modify the subpoena if compliance would be unreasonable or oppressive." *Id.* The standard for evaluating whether a subpoena is "unreasonable or oppressive" was articulated by the Supreme Court in *Nixon*; according to the Supreme Court, the party seeking to enforce a subpoena must demonstrate:

> (1) that the documents are evidentiary and relevant;
>
> (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence;
>
> (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and
>
> (4) that the application is made in good faith and is not intended as a "fishing expedition."

418 U.S. at 699-700. Courts have consistently ruled that Rule 17 was intended as a vehicle to secure specific pieces of evidence for trial and, conversely, that Rule 17 "was not intended to provide a means of discovery for criminal cases." *Id.* at 698-700; *see also United States v. Gonzalez-Acosta,* 989 F.2d 384, 389 (10th Cir. 1993); *United States v. Brooks,* 966 F.2d 1500, 1505 (D.C. Cir. 1992); *United States v. Arditti*, 955 F.2d 331, 346 (5th Cir. 1992); *United States v. George*, 883 F.2d 1407, 1418 (9th Cir. 1989).

Rather, Rule 16 defines the permissible limits of discovery in criminal cases. *See United States v. Buckley,* 586 F.2d 498, 506 (5th Cir. 1978), *cert. denied,* 440 U.S. 982 (1979). It is improper to use a Rule 17 subpoena to circumvent the proscriptions of Rule 16. *See United States v. Edwards,* 191 F. Supp. 2d 88 (D.D.C. 2002) ("While a Rule 17(c) subpoena *duces tecum* is a legitimate device to obtain evidentiary material, it was never intended to be a broad discovery device going beyond that which is required either by Rule 16 of the Federal Rules of Criminal Procedure or by *Brady.*"); *United States v. Ferguson,* 37 F.R.D. 6 (D.D.C. 1965).

A Rule 17(c) subpoena cannot properly be issued upon a "mere hope." *See United States v. Hang*, 75 F.3d 1275, 1283-84 (8th Cir. 1996) (noting that the defendant's request "is replete with conjecture as to the contents of the materials that might have turned up"). Courts have also strictly enforced the "specificity" prong under the *Nixon* test. *See United States v. Morris*, 287 F.3d 985, 991-992 (10th Cir. 2002). "The specificity requirement ensures that a Rule 17(c) subpoena

will not be used as a fishing expedition to see what may turn up." *United States v. Libby*, 432 F. Supp. 2d 26, 32 (D.D.C. 2006) (internal quotation marks and citation omitted).

## II. Argument

Defendant Meggs's motion for a subpoena should be denied because it seeks to circumvent the discovery process. Most of the information, data, and records sought in Defendant Meggs's proposed subpoena have already been produced or will be produced through the discovery process. Moreover, the subpoena fails *Nixon*'s specificity requirement: it is simply a "fishing expedition" to see what turns up. *See id*.

We have offered to walk Defendant Meggs's counsel through the discovery and assist him in identifying this footage among the discovery materials.[1] We believe once his counsel obtains and reviews the discovery, including consulting with us regarding specific materials or requests, the relief he seeks in the proposed subpoena will be moot.

The defendant's requests can be summarized as seeking information about (a) pipe bombs; (b) through (e), the reason each chamber recessed; and (f) through (i), Kelly Meggs's entrance into the Capitol around 2:40 p.m. None of these is an appropriate category for a subpoena to the U.S. Capitol Police.

### A. The Proposed Subpoena Seeks to Circumvent the Discovery Process

The government has already provided in discovery, or is in the process of providing in

---

[1] As Mr. Moseley stated at the status hearing on December 6, 2021, he has not had an opportunity to review the vast majority of the discovery materials provided in this case to date. Indeed, he has not yet provided the government with a hard drive to produce this data to him, and Defendant Meggs's predecessor counsel, David Wilson, reported to the government after the hearing on December 6 that he never received a request or instructions from Mr. Moseley to ship the hard drive currently in Mr. Wilson's possession.

3

discovery,[2] much of the information sought in the proposed subpoena to the Capitol Police.

      1. *Pipe bombs (category (a))*

As the defendant pointed out in his motion, former Capitol Police Chief Steven Sund[3] testified before a Senate committee that the discovery of the pipe bombs caused the Capitol Police to evacuate certain office buildings. Mot. at 8 & n.5 (quoting Mr. Sund's statement that the discovery of the pipe bombs "resulted in the evacuation of two congressional buildings"). Mr. Sund explained in his prepared testimony that pipe bombs had been located at the Republican National Committee Headquarters at 12:52 p.m. and at the Democratic National Committee Headquarters at 1:50 p.m., and that "[a]s a result of these explosive devices, extensive USCP resources were dispatched to the scenes, and two congressional office buildings had to be evacuated." Written Testimony of USCP Former Chief of Police Steven A. Sund before the Senate Committee on Rules and Administration and the Senate Homeland Security and Government Affairs Committee (Feb. 23, 2021), at 5-6, available at https://www.rules.senate.gov/imo/media/doc/Testimony_Sund.pdf. Sund said nothing about evacuating the Capitol building itself. And for good reason: the government's information is that the Capitol building itself was never "evacuated" on January 6; rather, it was "locked down."

Moreover, both the Senate and the House continued in session well after the discovery of the two pipe bombs, further undercutting Defendant Meggs's statement that the pipe bombs "*triggered* a recess," Mot. at 11. As seen on the official video feeds of the Senate's and House's proceedings, Vice President Pence was still presiding over the Senate chamber as of 2:10 p.m.:

---

    [2] As the government explained in the most recent status report on discovery and at the status hearing on December 6, 2021, discovery is ongoing.

    [3] At the time of his testimony on February 23, 2021, Mr. Sund was a civilian who was not testifying on behalf of the Capitol Police; he had resigned from the Capitol Police around January 16, 2021.

4



Likewise, Speaker Pelosi was still presiding over the House chamber as of 2:14 p.m.:



Regardless, the government has provided in discovery the Capitol Police's radio runs from January 6, which include communications about the discovery of the pipe bombs and the Capitol Police's response. The government has also provided in discovery a report from the Metropolitan Police Department's (MPD) Internal Affairs Division (IAD), which provides a timeline and additional information about MPD's response to the report of the pipe bombs.

2. *Reason for recess (categories (b) through (e))*

Subparts (b) through (e) of Defendant Meggs's proposed subpoena seem to be designed at answering the question of why the Joint Session was recessed and/or why certain members of

5

Congress left their respective chambers on January 6, 2021. We believe the Capitol Police's radio runs—which we have already produced in discovery, along with draft transcripts—contain some of the information sought by the proposed subpoena. The defense has not articulated, and we are not aware of, what other documents or pieces of evidence would be in the *Capitol Police*'s possession that would explain why the presiding officers of the two chambers—Senator Grassley at 2:13 p.m. in the Senate chamber and Representative McGovern at 2:29 p.m. in the House chamber, *see* 167 Cong. Rec. S18, H85 (daily ed. Jan. 6, 2021)—declared the respective Houses in recess subject to the call of the chair.

Apart from the Capitol Police, the government has interviewed several individuals who work directly for the House or Senate. In connection with the larger Capitol Breach investigation, we are in the process of disclosing these interview memoranda, some of which include information about what was occurring in each chamber on January 6 that may bear on the question of why each presiding officer declared a recess.

3. *Defendant Kelly Meggs's Entrance (categories (f) through (i))*

The proposed subpoena also seeks information about Defendant Kelly Meggs's entry into the Capitol building (categories (f) through (i)). In connection with this particular case, we have already provided in discovery footage from all of the U.S. Capitol Police surveillance video cameras that capture the entrance of Defendant Meggs and his co-defendants into the Capitol. We have also provided publicly available or "open source" video of Defendant Meggs's breach of the Capitol. With respect to bodyworn camera (BWC) footage, our investigation to date suggests that only USCP officers, who were not equipped with BWC, were located at that entrance at that time. In other words, the government does not believe there is BWC that captures Defendant Meggs's entrance into the building.

In addition, in connection with the larger Capitol Breach investigation, we have provided

6

access to "over 23,000 files consisting of USCP CCV, BWC and USSS surveillance footage." Memo. Regarding Status of Discovery as of Nov. 5, 2021 (ECF 481) at 2.

In connection with this particular case, we have identified for the defense and provided in discovery the memoranda of interviews of officers we have identified as being stationed at the East Rotunda doors at 2:40 p.m. on January 6, 2021. Once again, we have offered to help counsel locate these materials within the discovery. And once again, in connection with the larger Capitol Breach investigation, we have provided memoranda of interviews of dozens of Capitol Police officers (with many more to come).

Additionally, in connection with the larger Capitol Breach investigation, we have also provided the results of all closed internal investigations into Capitol Police officers alleged to have acted in a way that was construed as inviting, encouraging, or approving the entrance of individuals like Defendant Meggs into the Capitol on January 6, 2021. We also have brought to the defense's attention specific law enforcement members who interacted with the defendants charged in this case or other members and affiliates of the Oath Keepers, and we have provided discovery about those interactions. In other words, we also believe the discovery process has or will afford Defendant Meggs and his counsel access to the materials responsive to this request.

B.  The Proposed Subpoena Does Not Satisfy the *Nixon* Factors

Eight of the nine proposed categories in the subpoena seek "[a]ny and all documents, communications, reports, letters, text messages, emails, or other records relating to, discussing or reporting on" a certain topic; the ninth proposed category seeks "[a]ny and all video recordings" on a topic. By their very terms, each category lacks the specificity required by *Nixon*. *See Libby*, 432 F. Supp. 2d at 32. Defendant Meggs's motion does not identify the documents he believes exist. As the Eighth Circuit explained when affirming a denial of a proposed Rule 17 subpoena for failing to meet the specificity required by *Nixon*, "[n]ot only is [the defendant] unable to specify

what the items he requests contain, he is unable to verify whether the requested material even exists." *Morris*, 287 F.3d at 991.

At bottom, many of the categories sought by Defendant Meggs's proposed subpoena seem to be designed at answering the question of why the Joint Session was recessed and/or why certain members of Congress left their respective chambers on January 6, 2021. But a Rule 17(c) subpoena must seek a specific document or piece of evidence; it cannot be used like a civil discovery mechanism to seek to answer a question.

### III. Conclusion

Defendant Kelly Meggs's motion for a subpoena should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By: _____
Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar No. 994559
Ahmed M. Baset
Troy A. Edwards, Jr.
Jeffrey S. Nestler
Assistant United States Attorneys
Louis Manzo
Special Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

/s/ Alexandra Hughes
Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division

United States Department of Justice
950 Pennsylvania Avenue
NW Washington, D.C. 20004